06-1760-ag(L), 06-2750-ag (Con.), 06-5358-ag (Con.)
Fox Television Stations, Inc. v. FCC

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2009

(Argued: January 13, 2010,                                    Decided: July 13, 2010)


Docket Nos. 06-1760-ag, 06-2750-ag, 06-5358-ag

_____

FOX TELEVISION STATIONS, INC., CBS BROADCASTING INC., WLS TELEVISION, INC., KTRK TELEVISION, INC., KMBC HEARST-ARGYLE TELEVISION, INC., ABC INC.,

Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION, UNITED STATES OF AMERICA,

Respondents,

NBC UNIVERSAL, INC., NBC TELEMUNDO LICENSE CO., NBC TELEVISION AFFILIATES, FBC TELEVISION AFFILIATES ASSOCIATION, CBS TELEVISION NETWORK AFFILIATES, CENTER FOR THE CREATIVE COMMUNITY, INC., DOING BUSINESS AS CENTER FOR CREATIVE VOICES IN MEDIA, INC., ABC TELEVISION AFFILIATES ASSOCIATION,

Intervenors.

_____

LEVAL, POOLER, and HALL, Circuit Judges.

_____

This petition for review comes before us on remand from the Supreme Court. Previously, we held, with Judge Leval in dissent, that the indecency policy of the Federal Communications Commission ("FCC") was arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). See Fox Television Stations, Inc. v. FCC, 489 F.3d 444, 462

(2d Cir. 2007). The Supreme Court reversed, upholding the policy under the APA and remanding for consideration of petitioners' constitutional arguments. See Fox Television Stations, Inc. v. FCC, 129 S. Ct. 1800, 1819 (2009) (Scalia, J.). We now hold that the FCC's policy violates the First Amendment because it is unconstitutionally vague, creating a chilling effect that goes far beyond the fleeting expletives at issue here. Thus, we grant the petition for review and vacate the FCC's order and the indecency policy underlying it.

CARTER PHILLIPS, Sidley Austin LLP, Washington, DC (R. Clark Wadlow, Jennifer Tatel, David S. Petron, Sidley Austin LLP, Washington, DC; Ellen S. Agress, Maureen A. O'Connell, Fox Television Stations, Inc., New York, NY, on the brief), for petitioner Fox Television Stations, Inc.

MIGUEL ESTRADA, Gibson, Dunn & Crutcher LLP, Washington, D.C., (Susan Weiner, NBC Universal, Inc., on the brief) for intervenors NBC Universal Inc. and Telemundo License Co.

JACOB LEWIS, Associate General Counsel, for Austin C. Schlick, General Counsel, Federal Communications Commission, Washington, D.C. (Joseph R. Palmore, Deputy General Counsel, Federal Communications Commission, Washington, DC; Tony West, Assistant Attorney General, Thomas M. Bondy, Anne Murphy, Civil Division, U.S. Department of Justice, Washington, DC, on the brief), for respondents.

Robert Corn-Revere, Ronald G. London, Amber L. Husbands, Davis Wright Tremaine LLP, Washington, DC; Jonathan H. Anschell, Susanna M. Lowy, CBS Broadcasting Inc., New York, NY, for petitioner CBS Broadcasting Inc.

Seth P. Waxman, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC; John W. Zucker, ABC, Inc., New York, NY, for petitioners ABC, Inc., WLS Television, Inc., and KTRK Television, Inc.

Wade H. Hargrove, Mark J. Prak, David Kushner, Julia

Ambrose, Brooks, Peirce, McLendon, Humphrey & Leonard, LLP, Raleigh, NC, for intervenor ABC Television Affiliates Association.

Robert Long, Covington & Burling, Washington, DC, for intervenor NBC Television Affiliates Association.

Andrew Jay Schwartzman, Parul P. Desai, Matthew Wood, Media Access Project, Washington, DC, for intervenors Center for Creative Voices and Future of Music Coalition.

Michael R. Patrick, Renzulli Law Firm, White Plains, NY; Robert M. O'Neil, J. Joshua Wheeler, Eisha Jain, The Thomas Jefferson Center for Protection of Free Expression, for amici curiae The Thomas Jefferson Center for the Protection of Free Expression and The Media Institute.

Nancy Winkelman, Timothy K. Lewis, Carl A. Solano, Mark Fowler, Jerald Fritz, Henry Geller, Newton N. Minow, James H. Quello, Glen O. Robinson, Kenneth G. Robinson, Jr., Schnader Harrrison Segal & Lewis LLP, Philadelphia, PA, for amici curiae former FCC Commissioners and Officials.

Christopher Hansen, Benjamin Sahl, American Civil Liberties Union, New York, NY, for amici curiae American Civil Liberties Union, New York Civil Liberties Union, American Booksellers Foundation for Free Expression, American Federal of Television and Radio Artists, Directors Guild of America, First Amendment Project, Minnesota Public Radio/American Public Media, National Alliance for Media Arts and Culture, the National Coalition Against Censorship, National Federation of Community Broadcasters, PEN American Center, Screen Actors Guild, Washington Area Lawyers for the Arts, Woodhull Freedom Foundation, Writers Guild of America, West, Writers Guild of America, East.

Steven H. Aden, Patrick A. Trueman, Alliance Defense Fund, Washington, DC; Joel B. Campbell, Law Offices of Richard J. Yrulegui, Fresno, CA, for amici curiae Focus on the Family and Family Research Council.

Robert W. Peters, Robin S. Whitehead, Morality in Media,

Inc., New York, NY, for amicus curiae Morality in Media, Inc.

Robert R. Sparks, Jr., Sparks & Craig, LLP, McLean, VA, for amicus curiae Parents Television Council, Inc.

Thomas B. North, St. Ignace, MI, for amicus curiae Decency Enforcement Center for Television.

_____

POOLER, Circuit Judge:

This petition for review comes before us on remand from the Supreme Court. Previously we held, with Judge Leval dissenting, that the indecency policy of the Federal Communications Commission ("FCC" or "Commission") was arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). See Fox Television Stations, Inc. v. FCC, 489 F.3d 444, 462 (2d Cir. 2007). The Supreme Court reversed, upholding the policy under the APA and remanding for consideration of petitioners' constitutional arguments. See Fox Television Stations, Inc. v. FCC, 129 S. Ct. 1800, 1819 (2009) (Scalia, J.). We now hold that the FCC's policy violates the First Amendment because it is unconstitutionally vague, creating a chilling effect that goes far beyond the fleeting expletives at issue here. Thus, we grant the petition for review and vacate the FCC's order and the indecency policy underlying it.[1]

**BACKGROUND**

Section 1464 of Title 18 of United States Code provides that "[w]hoever utters any obscene, indecent, or profane language by means of radio communication shall be fined under this title or imprisoned not more than two years, or both." In 1960, Congress authorized the FCC

_____

[1] We address only the petition for review filed in Docket No. 06-5358, the other two petitions having been previously dismissed as moot by this Court. Fox, 489 F.3d at 447 n.2.

to impose civil forfeitures for violations of Section 1464.  See 47 U.S.C. § 503(b)(1)(D).  It was

not until 1975, however, that the FCC first exercised its authority to regulate speech it deemed

indecent but not obscene.  The speech at issue was comedian George Carlin's "Filthy Words"

monologue, a 12-minute string of expletives broadcast on the radio at 2:00 in the afternoon.

The FCC brought forfeiture proceedings against the Pacifica Foundation, the broadcaster

that had aired the Carlin monologue. Citizen's Complaint Against Pacifica Found. Station WBAI

(FM), N.Y, N.Y., 56 F.C.C.2d 94 (1975).  In finding that Pacifica had violated Section 1464, the

Commission defined "indecent" speech as "language that describes, in terms patently offensive

as measured by contemporary community standards for the broadcast medium, sexual or

excretory activities and organs, at times of the day when there is a reasonable risk that children

may be in the audience." Id. at ¶ 11.  Pacifica petitioned for review to the D.C. Circuit, which

declared the FCC's indecency regime invalid.  See Pacifica Found. v. FCC, 556 F.2d 9 (D.C.

Cir. 1977).  In finding the FCC's order both vague and overbroad, the court pointed out that the

Commission's definition of indecent speech would prohibit "the uncensored broadcast of many

of the great works of literature including Shakespearian plays and contemporary plays which

have won critical acclaim, the works of renowned classical and contemporary poets and writers,

and passages from the Bible." Id. at 14.  Such a result, the court concluded, amounted to

unconstitutional censorship. Id. at 18.

In a plurality opinion authored by Justice Stevens, the Supreme Court reversed.  See FCC

v. Pacifica Found., 438 U.S. 726 (1978).  The Court limited its review to the question of whether

the FCC could impose a civil forfeiture for the Carlin monologue and declined to address

Pacifica's argument that the regulation was overbroad and would chill protected speech. Id. at

734-35, 743 ("Invalidating any rule on the basis of its hypothetical application to situations not before the Court is 'strong medicine' to be applied 'sparingly and only as a last resort.'" (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973))).  In limiting its review, the Court stressed the "specific factual context" of the Carlin monologue, id. at 742, focusing in particular on Carlin's deliberate and repetitive use of expletives to describe sexual and excretory activities.

The Court then went on to hold that the FCC could, at least in the situation before it, restrict indecent speech in the broadcast context that did not meet the legal definition of obscenity.  Id. at 744 (concluding that "if the government has any such power [to restrict indecent speech], this was an appropriate occasion for its exercise").  Resting on a nuisance rationale, the Court first noted that "of all forms of communication, it is broadcasting that has received the most limited First Amendment protection" because of its "uniquely pervasive presence in the lives of all Americans."  Id. at 748.  Moreover, the nature of broadcast television – as opposed to printed materials – made it  "uniquely accessible to children, even those too young to read."  Id. at 749.  The Court, however, "emphasize[d] the narrowness of [its] holding."  Id. at 750.  "[N]uisance may be merely a right thing in the wrong place, – like a pig in the parlor instead of the barnyard. We simply hold that when the Commission finds that a pig has entered the parlor, the exercise of its regulatory power does not depend on proof that the pig is obscene."  Id. at 750-51 (internal quotation marks omitted).

Justices Powell and Blackmun, who concurred in a separate opinion, also made clear that the FCC's regulatory authority was limited, stating that the Court's holding did not give the FCC "an unrestricted license to decide what speech, protected in other media, may be banned from the airwaves in order to protect unwilling adults from momentary exposure to it in their homes."  Id.

at 759-60 (Powell, *J.*, concurring).  Nor, they explained, did the holding "speak to cases involving the isolated use of a potentially offensive word in the course of a radio broadcast, as distinguished from the verbal shock treatment administered by respondent here."  Id. at 760-61.  Finally, they took the FCC at its word that it would "proceed cautiously," which they reasoned would minimize any chilling effect that might otherwise result.  Id. at 761 n.4.

In the years after Pacifica, the FCC did indeed pursue a restrained enforcement policy, taking the position that its enforcement powers were limited to the seven specific words in the Carlin monologue.  See In re Application of WGBH Educ. Found., 69 F.C.C.2d 1250, at ¶ 10 (1978);  Infinity Broadcasting Corp., et al., 3 F.C.C. Rcd. 930, at ¶ 5 (1987) ("Infinity Order").  No enforcement actions were brought between 1978 and 1987.  Infinity Order, 3 F.C.C. Rcd. 930, at ¶ 4.  Then, in 1987, the FCC abandoned its focus on specific words, concluding that "although enforcement was clearly easier under the standard, it could lead to anomalous results that could not be justified."  Id. at  ¶ 5.  The FCC reasoned that under the prior standard, patently offensive material was permissible as long as it avoided certain words.  This, the Commission concluded, "made neither legal nor policy sense."  Id.  The Commission instead decided to utilize the definition it had used in Pacifica, adopting a contextual approach to indecent speech.

Despite its move to a more flexible standard, the FCC continued to exercise restraint.  In particular, it consistently held that a single, non-literal use of an expletive was not actionably indecent.  See, e.g., In re Application of WGBH Educ. Found, 69 F.C.C.2d 1250, at ¶ 10 n.6. (noting that the single use of an expletive in a program that aired at 5:30pm "should not call for us to act under the holding of Pacifica"); In re Regents of the Univ. of Cal., 2 F.C.C. Rcd. 2703, at ¶ 3 (1987) ("Speech that is indecent must involve more than an isolated use of an offensive

word."); L.M. Communications of S.C., Inc., 7 F.C.C. Rcd. 1595, 1595 (1992) (finding the single utterance of the F-word not indecent because it was a "fleeting and isolated utterance which, within the context of live and spontaneous programming, does not warrant a Commission sanction"); In re Application of Lincoln Dweller, Renewal of the License of Stations KPRL(AM) and KDDB(FM), 8 F.C.C. Rcd. 2582, 2585 (1993) (The "use of a single expletive" did not warrant further review "in light of the isolated and accidental nature of the broadcast.").

In 2001, in an attempt to "provide guidance to the broadcast industry regarding . . . [its] enforcement policies with respect to broadcast indecency," the FCC issued a policy statement in which it set forth its indecency standard in more detail. Industry Guidance on the Commission's Case Law Interpreting 18 U.S.C. § 1464, 16 F.C.C. Rcd 7999, at ¶ 1 (2001) ("Industry Guidance"). In Industry Guidance, the FCC explained that an indecency finding involved the following two determinations: (1) whether the material "describe[s] or depict[s] sexual or excretory organs or activities"; and (2) whether the broadcast is "patently offensive as measured by contemporary community standards for the broadcast medium." Id. at ¶¶ 7-8 (emphasis omitted). The FCC further explained that it considered the following three factors in determining whether a broadcast is patently offensive: (1) "the explicitness or graphic nature of the description or depiction"; (2) "whether the material dwells on or repeats at length" the description or depiction; and (3) "whether the material appears to pander or is used to titillate, or whether the materials appears to have been presented for its shock value." Id. at ¶ 10 (emphasis omitted). The Industry Guidance reiterated that under the second prong of the patently offensive test, "fleeting and isolated" expletives were not actionably indecent. Id. at ¶ 18.

In 2004, however, the FCC's policy on indecency changed. During the 2003 Golden

Globe Awards, U2 band member Bono exclaimed, upon receiving an award, "this is really, really, fucking brilliant. Really, really, great." In re Complaints Against Various Broadcast Licensees Regarding Their Airing of the "Golden Globe Awards" Program, 19 F.C.C. Rcd. 4975, at ¶ 3 n.4 (2004) ("Golden Globes Order"). In response to complaints filed after the incident, the FCC declared, for the first time, that a single, nonliteral use of an expletive (a so-called "fleeting expletive") could be actionably indecent.[2] Finding that "the 'F-Word' is one of the most vulgar, graphic, and explicit descriptions of sexual activity in the English language," id. at ¶ 9, and therefore "inherently has a sexual connotation," id. at ¶ 8, the FCC concluded that the fleeting and isolated use of the word was irrelevant and overruled all prior decisions in which fleeting use of an expletive was held per se not indecent, id. at ¶¶ 8-12. The FCC also found that the broadcast was "profane" within the meaning of Section 1464, abandoning its previous interpretation of the term to mean blasphemy. Id. at ¶¶ 13-14.

At the same time that the FCC expanded its enforcement efforts to include even fleeting expletives, the FCC also began issuing record fines for indecency violations.[3] While the Commission had previously interpreted the maximum fines in the statute as applying on a per-

---

[2] The FCC's increased enforcement efforts – as well as Congress's decision to increase the maximum fines – were in large part caused by the broadcast of the 2004 Super Bowl, during which Justin Timberlake exposed Janet Jackson's breast for a fraction of a second during their halftime show, an event that came to be known as "Nipplegate." Frank Ahrens, The Price for On-Air Indecency Goes Up, Wash. Post (June 8, 2006), available at http://www.washingtonpost.com/wp-dyn/content/article/2006/06/07/AR2006060700287.html. The FCC imposed a $550,000 fine, which was overturned by the Third Circuit. See CBS Corp. v. FCC, 535 F.3d 167, 209 (3d Cir. 2008). After the Supreme Court issued its decision in Fox, it vacated the decision and remanded to the Third Circuit for reconsideration in light of Fox. See FCC v. CBS Corp., 129 S. Ct. 2176 (2009). The Third Circuit has yet to issue a new decision.

[3] In 2003, the FCC imposed $440,000 in fines. In 2004, it imposed a record $8 million in fines. See Former FCC Commissioners Br. at 10 n.6.

program basis, it began treating each licensee's broadcast of the same program as a separate violation, thereby multiplying the maximum fine the FCC could order for each instance of indecent speech. In addition, Congress amended Section 503(b)(2)(c)(ii) to increase the maximum fine permitted by a factor of 10 – from $32,500 to $325,000– meaning that the fine for a single expletive uttered during a broadcast could easily run into the tens of millions of dollars. See 47 U.S.C. § 503(b)(2)(c)(iii).

NBC Universal, Inc. ("NBC"), along with numerous other parties, filed petitions for reconsideration of the Golden Globes Order before the FCC, raising statutory and constitutional challenges to the new policy. While the petitions for reconsideration were pending, the FCC applied the Golden Globes Order policy in In Re Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005, 21 F.C.C. Rcd. 2664 (2006) ("Omnibus Order"), which the Commission stated was intended to "provide substantial guidance to broadcasters and the public" about what was considered indecent under the new policy. Id. at ¶ 2. In the Omnibus Order (which dealt with many more programs than are at issue in the present case), the Commission found four programs – the 2002 Billboard Music Awards, the 2003 Billboard Music Awards, various episodes of ABC's NYPD Blue, and CBS's The Early Show – indecent and profane under the Golden Globes standard.

All four programs involved what could be characterized as fleeting expletives. For instance, during the 2002 Billboard Music Awards, Cher, in an unscripted moment from her acceptance speech, stated: "People have been telling me I'm on the way out every year, right? So fuck 'em." Id. at ¶ 101. Similarly, during the 2003 Billboard Music Awards, Nicole Ritchie – on stage to present an award with Paris Hilton – made the following unscripted remark: "Have

you ever tried to get cow shit out of a Prada purse? It's not so fucking simple." Id. at ¶ 112 n.164. Episodes of NYPD Blue were found indecent based on several instances of the word "bullshit," id. at ¶ 125, while the CBS's The Early Show was found indecent on the basis of a guest's use of the word "bullshitter" to describe a fellow contestant on the reality TV show, Survivor: Vanuatu, id. at ¶ 137.

In finding these programs indecent and profane, the FCC reaffirmed its decision in the Golden Globes Order that any use of the word "fuck" was presumptively indecent and profane, id. at ¶¶ 102, 107, further concluding that any use of the word "shit" was also presumptively indecent and profane, id. at ¶¶ 138, 143. It also held that the four broadcasts in question were "patently offensive" because the material was explicit, shocking, and gratuitous, notwithstanding the fact that the expletives were fleeting and isolated. Id. ¶¶ 106, 120, 131, 141.

Fox Television Stations, Inc. ("Fox"), CBS Broadcasting Inc. ("CBS"), and ABC Inc. ("ABC"), as well as several network affiliates, filed petitions for review of the Omnibus Order.[4] The FCC moved for a voluntary remand, which we granted, so that it could have the opportunity to address petitioners' arguments and could ensure that all licensees had a full opportunity to be heard before the FCC issued a final decision. After soliciting public comments, the FCC issued a second order on November 6, 2006. See In re Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005, 21 F.C.C. Rcd. 13299 (2006) ("Remand Order"). In the Remand Order, the FCC reaffirmed its finding that the 2002 and 2003 Billboard Music Awards were indecent and profane. However, the FCC reversed its finding

---

[4] ABC originally filed a petition for review in the D.C. Circuit, which was then transferred to this Court and consolidated with the Fox/CBS petitions for review.

with respect to The Early Show and dismissed the complaint against NYPD Blue on procedural grounds.[5]

In the Remand Order, the FCC rejected the petitioners' argument that non-literal uses of expletives were not indecent, reasoning that "any strict dichotomy between expletives and descriptions or depictions of sexual or excretory functions is artificial and does not make sense in light of the fact that an expletive's power to offend derives from its sexual or excretory meaning." Id. at ¶ 23 (internal quotation marks omitted). However, the Commission did "not take the position that any occurrence of an expletive is indecent or profane under its rules," allowing that expletives that were "integral" to an artistic work or occurring during a "bona fide news interview" might not run afoul of the indecency standard. Id. at ¶ 70 (emphasis added). As such, it reversed its previous decision concerning the CBS's The Early Show because the utterance of the word "bullshitter" took place during a bona fide news interview. The Commission made clear, however, that "there is no outright news exemption from our indecency rules." Id. at ¶ 71.

Petitioners and intervenors,[6] which collectively represented all the major broadcast networks as well as local affiliates affected by the FCC's indecency policy (hereinafter, the "Networks"), returned to this Court for review of the Remand Order, making a variety of

_____

[5] The Commission dismissed the complaints against NYPD Blue because the only person who complained of the material resided in the Eastern time zone, where NYPD Blue aired during the "safe harbor" period after 10pm. Id. at ¶ 75.

[6] Intervenors included NBC Universal, Inc., NBC Telemundo License Co., NBC Television Affiliates, FBC Television Affiliates, CBS Television Networks Affiliation, and ABC Television Affiliates Association. On remand from the Supreme Court, the Center for Creative Voices and Future of Music Coalition, which represents the artistic community, filed a motion to intervene, which we granted.

administrative, statutory, and constitutional arguments. In a 2-1 decision (with Judge Leval in dissent), we held that the FCC's indecency policy was arbitrary and capricious under the APA. Fox, 489 F.3d at 447. We reached this decision because we believed that the FCC had failed to adequately explain why it had changed its nearly-30-year policy on fleeting expletives. Id. at 458. Moreover, we noted that the FCC's justification for the policy – that children could be harmed by hearing even one fleeting expletive (the so-called "first blow" theory) – bore "no rational connection to the Commission's actual policy," because the FCC had not instituted a blanket ban on expletives. Id.

Because we struck down the indecency policy on APA grounds, we declined to reach the constitutional issues in the case. We noted, however, that we were "skeptical that the Commission [could] provide a reasoned explanation for its 'fleeting expletive' regime that would pass constitutional muster." Id. at 462. We expressed sympathy for "the Networks' contention that the FCC's indecency test [wa]s undefined, indiscernible, inconsistent, and consequently, unconstitutionally vague." Id. at 463. We were also troubled that the FCC's policy appeared to permit it to "sanction speech based on its subjective view of the merit of that speech." Id. at 464. However, because it was unnecessary for us to reach them, we left those issues for another day. The FCC subsequently filed a writ of certiorari, which the Supreme Court granted.

In a 5-4 decision, the Supreme Court reversed our APA ruling, holding that the FCC's "fleeting expletive" policy was not arbitrary and capricious because "[t]he Commission could reasonably conclude that the pervasiveness of foul language, and the coarsening of public entertainment in other media such as cable, justify more stringent regulation of broadcast programs so as to give conscientious parents a relatively safe haven for their children." 129 S.

-13-

Ct. at 1819. However, the Court declined to address the Networks' constitutional arguments, "see[ing] no reason to abandon our usual procedures in a rush to judgment without a lower court opinion," id., and remanded for us to consider them in the first instance. Thus, after further briefing by the parties, intervenors, and amici, we now turn to the question that we deferred in our previous decision – whether the FCC's indecency policy violates the First Amendment.

## DISCUSSION

### I.

It is well-established that indecent speech is fully protected by the First Amendment. Reno v. ACLU, 521 U.S. 844, 874-75 (1997) ("Where obscenity is not involved, . . . the fact that protected speech may be offensive to some does not justify its suppression." (quoting Carey v. Population Servs. Int'l, 431 U.S. 678, 701 (1977))). In most contexts, the Supreme Court has considered restrictions on indecent speech to be content-based restrictions subject to strict scrutiny. See United States v. Playboy Entm't Group, 529 U.S. 803, 813 (2000). For instance, in Reno v. ACLU, the Supreme Court struck down the Communications Decency Act of 1996, finding that a provision criminalizing the knowing transmission of indecent speech through the internet was unconstitutionally vague and not narrowly tailored. 521 U.S. at 882. In Playboy, the Supreme Court confronted a provision of the Telecommunications Act of 1996 that prohibited cable television operators from broadcasting sexual content during certain hours. While recognizing that television "presents unique problems" not present in other mediums, the Court held unequivocally that the restriction was subject to strict scrutiny, and struck it down because scrambling technology provided a less restrictive means of protecting minors from indecent content. 529 U.S. at 813, 827. Similarly, the Supreme Court in Sable Communications

-14-

of California, Inc. v. FCC declared unconstitutional a provision of the Communications Act that prohibited the transmission of indecent commercial telephone messages, so-called "dial-a-porn," finding that a total ban was not the least restrictive means available. 492 U.S. 115, 131 (1989).

Broadcast radio and television, however, have always occupied a unique position when it comes to First Amendment protection. The categorization of broadcasting as different from all other forms of communication pre-dates Pacifica. See, e.g., Red Lion Broad. Co. v. FCC, 395 U.S. 367, 386 (1969) ("Although broadcasting is clearly a medium affected by a First Amendment interest, differences in the characteristics of new media justify differences in the First Amendment standards applied to them."(internal citation omitted)). And the Supreme Court has continuously reaffirmed the distinction between broadcasting and other forms of media since Pacifica. See Reno, 521 U.S. at 866-67; Sable, 492 U.S. at 127. However, it was in Pacifica that the Supreme Court gave its fullest explanation for why restrictions on broadcast speech were subject to a lower level of scrutiny, relying on the twin pillars of pervasiveness and accessibility to children. 438 U.S. at 748-49. While Pacifica did not specify what level of scrutiny applies to restrictions on broadcast speech, subsequent cases have applied something akin to intermediate scrutiny. See FCC v. League of Women Voters, 468 U.S. 364, 380 (1984).

The Networks argue that the world has changed since Pacifica and the reasons underlying the decision are no longer valid. Indeed, we face a media landscape that would have been almost unrecognizable in 1978. Cable television was still in its infancy. The Internet was a project run out of the Department of Defense with several hundred users. Not only did Youtube, Facebook, and Twitter not exist, but their founders were either still in diapers or not yet conceived. In this environment, broadcast television undoubtedly possessed a "uniquely pervasive presence in the

-15-

lives of all Americans." <u>Pacifica</u>, 438 U.S. at 748.

The same cannot be said today. The past thirty years has seen an explosion of media sources, and broadcast television has become only one voice in the chorus. Cable television is almost as pervasive as broadcast – almost 87 percent of households subscribe to a cable or satellite service – and most viewers can alternate between broadcast and non-broadcast channels with a click of their remote control. <u>See</u> <u>In re Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming</u>, 24 FCC Rcd. 542, at ¶ 8 (2009). The internet, too, has become omnipresent, offering access to everything from viral videos to feature films and, yes, even broadcast television programs. <u>See</u> <u>In Re Implementation of the Child Safe Viewing Act; Examination of Parental Control Technologies for Video or Audio Programming</u>, 24 F.C.C. Rcd. 11413, at ¶ 126 (2009) ("<u>CSVA Report</u>") ("The number of suppliers of online video and audio is almost limitless."). As the FCC itself acknowledges, "[c]hildren today live in a media environment that is dramatically different from the one in which their parents and grandparents grew up decades ago." <u>In the Matter of Empowering Parents and Protecting Children in an Evolving Media Landscape</u>, 24 F.C.C. Rcd. 13171, at ¶ 11 (2009).

Moreover, technological changes have given parents the ability to decide which programs they will permit their children to watch. Every television, 13 inches or larger, sold in the United States since January 2000 contains a V-chip, which allows parents to block programs based on a standardized rating system. 47 U.S.C. § 303(x). Moreover, since June 11, 2009, when the United States made the transition to digital television, anyone using a digital converter box also has access to a V-chip. <u>CSVA Report</u>, 24 F.C.C. Rcd. 11413, at ¶ 11. In short, there now exists a way to block programs that contain indecent speech in a way that was not possible in 1978. In

fact, the existence of technology that allowed for household-by-household blocking of "unwanted" cable channels was one of the principle distinctions between cable television and broadcast media drawn by the Supreme Court in Playboy. The Court explained:

> The option to block reduces the likelihood, so concerning to the Court in Pacifica, that traditional First Amendment scrutiny would deprive the Government of all authority to address this sort of problem. The corollary, of course, is that targeted blocking enables the Government to support parental authority without affecting the First Amendment interests of speakers and willing listeners – listeners for whom, if the speech is unpopular or indecent, the privacy of their own homes may be the optimal place of receipt.

Playboy, 529 U.S. at 815 (internal citation omitted). We can think of no reason why this rationale for applying strict scrutiny in the case of cable television would not apply with equal force to broadcast television in light of the V-chip technology that is now available.

Nevertheless, as we stated in our previous decision, we are bound by Supreme Court precedent, regardless of whether it reflects today's realities. The Supreme Court may decide in due course to overrule Pacifica and subject speech restrictions in the broadcast context to strict scrutiny. This Court, however, is "not at liberty to depart from binding Supreme Court precedent 'unless and until [the] Court reinterpret[s]' that precedent." OneSimpleLoan v. U.S. Sec'y of Educ., 496 F.3d 197, 208 (2d Cir. 2007) (quoting Agostini v. Felton, 521 U.S. 203, 238 (1997)) (alterations in original). The Networks, although they may wish it otherwise, seem to concede that we must evaluate the FCC's indecency policy under the framework established by the Supreme Court in Pacifica. See ABC Television Affiliates Association Br. at 12-13.

There is considerable disagreement among the parties, however, as to what framework Pacifica established. The FCC interprets Pacifica as permitting it to exercise broad regulatory authority to sanction indecent speech. In its view, the Carlin monologue was only the most

extreme example of a large category of indecent speech that the FCC can constitutionally prohibit. The Networks, on the other hand, view Pacifica as establishing the limit of the FCC's authority. In other words, they believe that only when indecent speech rises to the level of "verbal shock treatment," exemplified by the Carlin monologue, can the FCC impose a civil forfeiture. Because Pacifica was an intentionally narrow opinion, it does not provide us with a clear answer to this question. Fortunately, we do not need to wade into the brambles in an attempt to answer it ourselves. For we conclude that, regardless of where the outer limit of the FCC's authority lies, the FCC's indecency policy is unconstitutional because it is impermissibly vague. It is to this issue that we now turn.[7]

**II.**

It is a basic principle that a law or regulation "'is void for vagueness if its prohibitions are not clearly defined.'" Piscottano v. Murphy, 511 F.3d 247, 280 (2d Cir. 2007) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). A law or regulation is impermissibly vague if it does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." Farrell v. Burke, 449 F.3d 470, 485 (2d Cir. 2006) (quoting Grayned, 408 U.S. at 108). The First Amendment places a special burden on the government to ensure that restrictions on speech are not impermissibly vague. See Perez v. Hoblock, 368 F.3d 166, 175 n.5 (2d Cir. 2004) ("[A] law or regulation that 'threatens to inhibit the exercise of constitutionally protected rights,' such as the right of free speech, will generally be subject to a more stringent vagueness test.") (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S.

---

[7] Although, the Remand Order also found the broadcasts in question "profane," the FCC has abandoned that finding for the purposes of this appeal and has relied solely on its finding of indecency. See FCC Br. at 24 n.2. We therefore do not address its profanity finding further.

-18-

489, 499 (1982))).  However, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" United States v. Williams, 128 S. Ct. 1830, 1845 (2008) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989)).

The vagueness doctrine serves several important objectives in the First Amendment context.  First, the doctrine is based on the principle of fair notice.  "'[W]e assume that man is free to steer between lawful and unlawful conduct" and we give him notice of what is prohibited "so that he may act accordingly.'"  Farrell, 449 F.3d at 485 (quoting Grayned, 408 U.S. at 108). Notice is particularly important with respect to content-based speech restrictions "because of [their] obvious chilling effect on free speech."  Reno, 521 U.S. at 872.  Vague regulations "'inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.'"  Farrell, 449 F.3d at 485 (quoting Grayned, 408 U.S. at 109)).  Second, the vagueness doctrine is based "on the need to eliminate the impermissible risk of discriminatory enforcement."  Gentile v. State Bar of Nev., 501 U.S. 1030, 1051 (1991).  "A vague law impermissibly delegates basic policy matters to [government officials] for resolution on an ad hoc and subjective basis . . . ."  Grayned, 408 U.S. at 108-09 (emphasis added). Specificity, on the other hand, guards against subjectivity and discriminatory enforcement.

### A.

The Networks argue that the FCC's indecency test is unconstitutionally vague because it provides no clear guidelines as to what is covered and thus forces broadcasters to "steer far wider of the unlawful zone," rather than risk massive fines.  In support of their position, the Networks rely on the Supreme Court's decision in Reno v. ACLU, 521 U.S. 844 (1997).  Section 223(a) of the Communications Decency Act ("CDA") prohibited transmitting "indecent" material to

minors over the Internet while section 223(d) prohibited material that "in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs." Id. at 859-60 (quoting 47 U.S.C. § 223(d)). In addition to finding that the statute was not narrowly tailored, the Court found the statute unconstitutionally vague because "the many ambiguities concerning the scope of its coverage render[ed] it problematic for purposes of the First Amendment." Id. at 870. The Court found that the statute's use of the "general, undefined terms 'indecent' and 'patently offensive' cover[ed] large amounts of nonpornographic material with serious educational or other value. Because of the "vague contours" of the regulation, the Court held that "it unquestionably silence[d] some speakers whose messages would be entitled to constitutional protection." Id. at 874. The Networks argue that since Reno found this indecency regulation unconstitutionally vague, the FCC's identically-worded indecency test for broadcasting must fall as well.

FCC argues the opposite – that Reno forecloses a vagueness challenge to the FCC's policy. In Reno, the government argued that the CDA was "plainly constitutional" under the Pacifica decision. Id. at 864. The Supreme Court rejected this argument, distinguishing Pacifica on the grounds that (1) the FCC is an expert agency that had been regulating the radio for decades; (2) the CDA was a categorical ban on speech while the FCC's indecency regulation designated "when – rather than whether – it would be permissible to air such a program"; (3) the order at issue in Pacifica was not punitive; and (4) the broadcast medium had traditionally received the most limited First Amendment protection. Id. at 867. According to the FCC, because the Court refused to find Pacifica controlling of the constitutional challenges to the CDA, we must find Reno equally inapplicable here.

As an initial matter, we reject the FCC's argument that <u>Reno</u> forecloses the Networks' vagueness challenge. When the Supreme Court distinguished <u>Pacifica</u> in <u>Reno</u>, it did so with respect to "the level of First Amendment scrutiny that should be applied to this medium," not to its analysis of whether the statute was unconstitutionally vague. <u>Id.</u> at 870. Broadcasters are entitled to the same degree of clarity as other speakers, even if restrictions on their speech are subject to a lower level of scrutiny. It is the language of the rule, not the medium in which it is applied, that determines whether a law or regulation is impermissibly vague.

We also reject the Networks' argument that <u>Reno</u> requires us to find the FCC's policy vague. To be sure, the CDA's definition of indecency was almost identical to the Commission's, and language that is unconstitutionally vague in one context cannot suddenly become the model of clarity in another. However, unlike in <u>Reno</u>, the FCC has further elaborated on the definition of indecency in the broadcast context. For example, the FCC has outlined three factors that it purportedly uses to determine whether a broadcast is patently offensive, <u>Industry Guidance,</u> 16 F.C.C. Rcd. 7999, at ¶¶ 7-8, and has declared "fuck" and "shit" presumptively indecent, <u>Omnibus Order</u>, 2001 F.C.C. Rcd. 2664, at ¶¶ 102, 107. This additional guidance may not be sufficient to survive a vagueness challenge, but it certainly distinguishes the FCC policy from the one struck down in <u>Reno</u>.

Finally, we reject the FCC's argument that the Networks' vagueness challenge is foreclosed by <u>Pacifica</u> itself. <u>Pacifica</u>, which did not reach the question of whether the FCC's policy was unconstitutionally vague, was an intentionally narrow opinion predicated on the FCC's "restrained" enforcement policy. <u>Pacifica</u>, 438 U.S. at 761 (Powell J., concurring). The FCC's policy has now changed and we would be hard pressed to characterize it as "restrained."

Thus, the questions left unresolved by Pacifica are now squarely before us, as the Supreme Court itself indicated in its opinion above. See Fox, 129 S. Ct. at 1819 ("[W]hether [the FCC's policy] is unconstitutional, will be determined soon enough, perhaps in this very case.").[8]

**B.**

Having concluded that neither Pacifica nor Reno resolves the question, we must now decide whether the FCC's indecency policy provides a discernible standard by which broadcasters can accurately predict what speech is prohibited. The FCC set forth its indecency policy in its 2001 Industry Guidance, in which the FCC explained that an indecency finding involved the following two determinations: (1) whether the material "describe[s] or depict[s] sexual or excretory organs or activities"; and (2) whether the broadcast is "patently offensive as measured by contemporary community standards for the broadcast medium." Id. at ¶¶ 7-8. Under the policy, whether a broadcast is patently offensive depends on the following three factors: (1) "the explicitness or graphic nature of the description or depiction"; (2) "whether the material dwells on or repeats at length" the description or depiction; and (3) "whether the material appears to pander or is used to titillate, or whether the materials appears to have been

---

[8] The FCC also argues that the DC Circuit's Action for Children's Television cases preclude Networks' vagueness challenge, but this argument fails for the same reason its Pacifica argument fails. The DC Circuit, like the Supreme Court, relied specifically on the FCC's restrained policy in reaching its decision. See Action for Children's Television v. FCC, 852 F.2d 1332,1340 n.14 (D.C. Cir. 1988), superseded by 58 F.3d 654 (D.C. Cir. 1995) (en banc) ("[T]he potential chilling effect of the FCC's generic definition of indecency will be tempered by the Commission's restrained enforcement policy."). Moreover, to the extent the ACT cases held that a vagueness challenge was precluded by Pacifica, we are not bound by the DC Circuit and do not find it persuasive. To the extent that our opinion in Dial Information Services Corp. v. Thornburgh, 938 F.2d 1535, 1541 (2d Cir. 1991), held that the same definition of indecency was not impermissibly vague in the non-broadcast context, that holding was overruled by the Supreme Court's decision in Reno.

presented for its shock value." Id. at ¶ 10 (emphasis added). Since 2001, the FCC has interpreted its indecency policy in a number of decisions, including Golden Globes Order and the orders on review here.

The FCC argues that the indecency policy in its Industry Guidance, together with its subsequent decisions, give the broadcasters sufficient notice as to what will be considered indecent. The Networks argue that the policy is impermissibly vague and that the FCC's decisions interpreting the policy only add to the confusion of what will be considered indecent.

We agree with the Networks that the indecency policy is impermissibly vague. The first problem arises in the FCC's determination as to which words or expressions are patently offensive. For instance, while the FCC concluded that "bullshit" in a "NYPD Blue" episode was patently offensive, it concluded that "dick" and "dickhead" were not. Omnibus Order, 21 F.C.C. Rcd 2664, at ¶¶ 127-128. Other expletives such as "pissed off," up yours," "kiss my ass," and "wiping his ass" were also not found to be patently offensive. Id. at ¶ 197. The Commission argues that its three-factor "patently offensive" test gives broadcasters fair notice of what it will find indecent. However, in each of these cases, the Commission's reasoning consisted of repetition of one or more of the factors without any discussion of how it applied them. Thus, the word "bullshit" is indecent because it is "vulgar, graphic and explicit" while the words "dickhead" was not indecent because it was "not sufficiently vulgar, explicit, or graphic." This hardly gives broadcasters notice of how the Commission will apply the factors in the future.

The English language is rife with creative ways of depicting sexual or excretory organs or activities, and even if the FCC were able to provide a complete list of all such expressions, new offensive and indecent words are invented every day. For many years after Pacifica, the

FCC decided to focus its enforcement efforts solely on the seven "dirty" words in the Carlin monologue. See Infinity Order, 3 F.C.C. Rcd. 930, at ¶ 5 (1987). This strategy had its limitations – it meant that some indecent speech that did not employ these seven words slipped through the cracks. However, it had the advantage of providing broadcasters with a clear list of words that were prohibited. Not surprisingly, in the nine years between Pacifica and the FCC's abandonment of this policy, not a single enforcement action was brought. This could be because we lived in a simpler time before such foul language was common. Or, it could be that the FCC's policy was sufficiently clear that broadcasters knew what was prohibited.

The FCC argues that a flexible standard is necessary precisely because the list was not effective – broadcasters simply found offensive ways of depicting sexual or excretory organs or activities without using any of the seven words. In other words, because the FCC cannot anticipate how broadcasters will attempt to circumvent the prohibition on indecent speech, the FCC needs the maximum amount of flexibility to be able to decide what is indecent. The observation that people will always find a way to subvert censorship laws may expose a certain futility in the FCC's crusade against indecent speech, but it does not provide a justification for implementing a vague, indiscernible standard. If the FCC cannot anticipate what will be considered indecent under its policy, then it can hardly expect broadcasters to do so. And while the FCC characterizes all broadcasters as consciously trying to push the envelope on what is permitted, much like a petulant teenager angling for a later curfew, the Networks have expressed a good faith desire to comply with the FCC's indecency regime. They simply want to know with some degree of certainty what the policy is so that they can comply with it. The First Amendment requires nothing less.

The same vagueness problems plague the FCC's presumptive prohibition on the words "fuck" and "shit" and the exceptions thereto. Under the FCC's current policy, all variants of these two words are indecent unless one of two exceptions apply. The first is the "bona fide news" exception, which the FCC has failed to explain except to say that it is not absolute. The second is the artistic necessity exception, in which fleeting expletives are permissible if they are "demonstrably essential to the nature of an artistic or educational work or essential to informing viewers on a matter of public importance." Omnibus Order, 21 F.C.C. Rcd. 2664, at ¶ 82. In deciding whether this exception applies, the FCC "consider[s] whether the material has any social, scientific or artistic value." In re Complaints Against Various Television Licensees Regarding Their Broadcast on November 11, 2004, of the ABC Television Network's Presentation of the Film "Saving Private Ryan", 20 F.C.C. Rcd. 4507, at ¶ 11 (2005) ("Saving Private Ryan").

As we stated in our previous opinion:

Although the Commission has declared that all variants of "fuck" and "shit" are presumptively indecent and profane, repeated use of those words in "Saving Private Ryan," for example, was neither indecent nor profane. And while multiple occurrences of expletives in "Saving Private Ryan" was not gratuitous, a single occurrence of "fucking" in the Golden Globe Awards was "shocking and gratuitous." Parental ratings and advisories were important in finding "Saving Private Ryan" not patently offensive under contemporary community standards, but irrelevant in evaluating a rape scene in another fictional movie. The use of numerous expletives was "integral" to a fictional movie about war, but occasional expletives spoken by real musicians were indecent and profane because the educational purpose of the documentary "could have been fulfilled and all viewpoints expressed without the repeated broadcast of expletives." The "S-Word" on The Early Show was not indecent because it was in the context of a " bona fide news interview," but "there is no outright news exemption from our indecency rules."

Fox, 489 F.3d at 463 (internal citations and emphasis omitted). There is little rhyme or reason to

these decisions and broadcasters are left to guess whether an expletive will be deemed "integral" to a program or whether the FCC will consider a particular broadcast a "<u>bona</u> <u>fide</u> news interview."

The FCC created these exceptions because it recognized that an outright ban on certain words would raise grave First Amendment concerns. In the <u>Omnibus Order</u>, the FCC "recognize[d] the need for caution with respect to complaints implicating the editorial judgment of broadcast licensees in presenting news and public affairs programming, as these matters are at the core of the First Amendment's free press guarantee." 21 F.C.C. Rcd. 2664, at ¶ 15. Likewise, in applying the "artistic necessity" exception, the FCC noted that it was obligated to "proceed with due respect for the high value our Constitution places on freedom and choice in what the people say and hear," particularly with respect to speech that has "social, scientific or artistic value." <u>Saving Private Ryan</u>, 20 F.C.C. Rcd. 4507, at ¶ 11 (internal quotation marks omitted). It is these same concerns that informed the FCC's original "restrained" enforcement policy, which had the advantage of prohibiting the most egregious instances of indecent speech while minimizing the burden on protected speech.

The FCC's current indecency policy undoubtedly gives the FCC more flexibility, but this flexibility comes at a price. The "artistic necessity" and "<u>bona</u> <u>fide</u> news" exceptions allow the FCC to decide, in each case, whether the First Amendment is implicated. The policy may maximize the amount of speech that the FCC can prohibit, but it results in a standard that even the FCC cannot articulate or apply consistently. Thus, it found the use of the word "bullshitter" on CBS's The Early Show to be "shocking and gratuitous" because it occurred "during a morning television interview," <u>Omnibus Order</u>, 21 FCC Rcd 2664, at ¶ 141, before reversing

-26-

itself because the broadcast was a "bona fide news interview." Remand Order, 21 FCC Rcd. 13299, at ¶ 68. In other words, the FCC reached diametrically opposite conclusions at different stages of the proceedings for precisely the same reason – that the word "bullshitter" was uttered during a news program. And when Judge Leval asked during oral argument if a program about the dangers of pre-marital sex designed for teenagers would be permitted, the most that the FCC's lawyer could say was "I suspect it would." With millions of dollars and core First Amendment values at stake, "I suspect" is simply not good enough.

With the FCC's indiscernible standards come the risk that such standards will be enforced in a discriminatory manner. The vagueness doctrine is intended, in part, to avoid that risk. If government officials are permitted to make decisions on an "ad hoc" basis, there is a risk that those decisions will reflect the officials' subjective biases. Grayned, 408 U.S. at 108-09. Thus, in the licensing context, the Supreme Court has consistently rejected regulations that give government officials too much discretion because "such discretion has the potential for becoming a means of suppressing a particular point of view." Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 130 (1992) (internal quotation marks omitted); see also City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 758 (1988) (permit scheme facially unconstitutional because "post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression").

We have no reason to suspect that the FCC is using its indecency policy as a means of suppressing particular points of view. But even the risk of such subjective, content-based

decision-making raises grave concerns under the First Amendment. Take, for example, the disparate treatment of "Saving Private Ryan" and the documentary, "The Blues." The FCC decided that the words "fuck" and "shit" were integral to the "realism and immediacy of the film experience for viewers" in "Saving Private Ryan," but not in "The Blues." Fox, 489 F.3d at 463. We query how fleeting expletives could be more essential to the "realism" of a fictional movie than to the "realism" of interviews with real people about real life events, and it is hard not to speculate that the FCC was simply more comfortable with the themes in "Saving Private Ryan," a mainstream movie with a familiar cultural milieu, than it was with "The Blues," which largely profiled an outsider genre of musical experience. But even if there were a perfectly benign way of explaining these particular outcomes, nothing would prevent the FCC from applying its indecency policy in a discriminatory manner in the future. As the Supreme Court explained in Forsyth:

> It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion. Accordingly, the success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so.

505 U.S. at 133 n.10 (internal quotation marks and citations omitted).

The FCC argues that its context-based approach is consistent with, indeed even required by, Pacifica. While Pacifica emphasized the importance of context in regulating indecent broadcasts, see 438 U.S. at 750, it did so in order to emphasize the limited scope of its holding, finding that the particular "context" of the Carlin monologue justified an intrusion on broadcasters rights under the First Amendment. It does not follow that the FCC can justify any decision to sanction indecent speech by citing "context." Of course, context is always relevant,

and we do not mean to suggest otherwise in this opinion.  But the FCC still must have discernible standards by which individual contexts are judged.

The FCC assures us that it will "bend over backwards" to protect editorial judgment, at least in the news context, but such assurances are not sufficient given the record before us.  Instead, the FCC should bend over backwards to create a standard that gives broadcasters the notice that is required by the First Amendment.[9]

### III.

Under the current policy, broadcasters must choose between not airing or censoring controversial programs and risking massive fines or possibly even loss of their licenses, and it is not surprising which option they choose.  Indeed, there is ample evidence in the record that the FCC's indecency policy has chilled protected speech.

For instance, several CBS affiliates declined to air the Peabody Award-winning "9/11" documentary, which contains real audio footage – including occasional expletives – of firefighters in the World Trade Center on September 11th.  Although the documentary had previously aired twice without complaint, following the Golden Globes Order affiliates could no longer be sure whether the expletives contained in the documentary could be found indecent. See Larry Neumeister, "Some CBS Affiliates Worry over 9/11 Show," Associated Press, Sept. 3, 2006.  In yet another example, a radio station cancelled a planned reading of Tom Wolfe's novel I Am Charlotte Simmons, based on a single complaint it received about the "adult" language in

---

[9] The FCC  recently filed a letter pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure drawing our attention to certain language in the Supreme Court's recent decision in *Humanitarian Law Project v. Holder*, No. 08-1498, 2010 WL 2471055 (June 21, 2010).  Given the entirely different procedural posture in *Humanitarian Law Project*, we conclude that it is inapposite to the issues before us here.

the book, because the station feared FCC action. When the program was reinstated two weeks later, the station decided that it could only safely air the program during the "safe harbor" period.

The FCC's application of its policy to live broadcasts creates an even more profound chilling effect. In the case of the 2003 Billboard Music Awards broadcasts, Fox had an audio delay system in place to bleep fleeting expletives. It also pre-cleared the scripts of the presenters. Ritchie, however, departed from her script and used three expletives in rapid sequence. While the person employed to monitor and bleep expletives was bleeping the first, the following two slipped through. Even elaborate precautions will not protect a broadcaster against such occurrences. The FCC argues that Fox should simply implement a more effective screening system, but, short of giving up live broadcasting altogether, no system will ever be one hundred percent effective.[10] Instead, Fox may decide not to ask individuals with a history of using profanity to present at its awards shows.[11] But, of course, this will not prevent someone who wins an award – such as Cher or Bono – from using fleeting expletives. In fact, the only way that Fox can be sure that it won't be sanctioned by the FCC is by refusing to air the broadcast live.

This chilling effect extends to news and public affairs programming as well.

---

[10] Nor would such a system be costless for broadcasters. For instance, Fox estimates that installing an audio delay system for all live programming would cost an estimated $16 million a year.

[11] Indeed, there is evidence in the record that broadcasters have made personnel decisions on the basis of the FCC's indecency policy. For instance, public radio personality Sandra Loh was fired after a single use of an expletive as "a precautionary measure to show the station had distanced itself . . . in case the FCC investigates." Greg Braxton, "KCRW Fires Loh Over Obscenity," L.A. Times (Mar. 4, 2004), available at http://articles.latimes.com/2004/mar/04/local/me-loh4.

Broadcasters may well decide not to invite controversial guests on to their programs for fear that an unexpected fleeting expletive will result in fines. The FCC points to its "bona fide news" exception to show that such fears would be unfounded. But the FCC has made clear that it considers the decision to apply this exception a matter within its discretion. Otherwise, why not simply make an outright news exception? During the previous proceedings before this Court, amicus curiae gave the example of a local station in Vermont that refused to air a political debate because one of the local politicians involved had previously used expletives on air. The record contains other examples of local stations that have forgone live programming in order to avoid fines. For instance, Phoenix TV stations dropped live coverage of a memorial service for Pat Tillman, the former football star killed in Afghanistan, because of language used by Tilliman's family members to express their grief. A station in Moosic, Pennsylvania submitted an affidavit stating that in the wake of the FCC's new policy, it had decided to no longer provide live, direct-to-air coverage of news events "unless they affect matters of public safety or convenience."[12] If the FCC's policy is allowed to remain in place, there will undoubtedly be countless other situations where broadcasters will exercise their editorial judgment and decline to pursue contentious people or subjects, or will eschew live programming altogether, in order to avoid the FCC's fines. This chill reaches speech at the heart of the First Amendment.

The chill of protected speech has even extended to programs that contain no expletives, but which contain reference to or discussion of sex, sexual organs, or excretion. For instance,

---

[12] Nor are these concerns unfounded. The Commission currently has several pending investigations concerning expletives uttered during live news and sports programming. For instance, after a surprise win against Notre Dame, the University of Pittsburgh quarterback stated that he was "so fucking proud of our football team" on live television. The FCC's investigation into this incident is ongoing.

Fox decided not to re-broadcast an episode of "That 70s Show" that dealt with masturbation, even though it neither depicted the act or discussed it in specific terms. The episode subsequently won an award from the Kaiser Family Foundation for its honest and accurate depiction of a sexual health issue. Similarly, an episode of "House" was re-written after concerns that one of the character's struggles with psychiatric issues related to his sexuality would be considered indecent by the FCC.

As these examples illustrate, the absence of reliable guidance in the FCC's standards chills a vast amount of protected speech dealing with some of the most important and universal themes in art and literature. Sex and the magnetic power of sexual attraction are surely among the most predominant themes in the study of humanity since the Trojan War. The digestive system and excretion are also important areas of human attention. By prohibiting all "patently offensive" references to sex, sexual organs, and excretion without giving adequate guidance as to what "patently offensive" means, the FCC effectively chills speech, because broadcasters have no way of knowing what the FCC will find offensive. To place any discussion of these vast topics at the broadcaster's peril has the effect of promoting wide self-censorship of valuable material which should be completely protected under the First Amendment.

## IV.

For the foregoing reasons, we strike down the FCC's indecency policy. We do not suggest that the FCC could not create a constitutional policy. We hold only that the FCC's current policy fails constitutional scrutiny. The petition for review is hereby GRANTED.