(Slip Opinion)           OCTOBER  TERM,  2011                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FEDERAL COMMUNICATIONS COMMISSION ET AL. *v.* FOX TELEVISION STATIONS, INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 10–1293.   Argued January 10, 2012—Decided June 21, 2012*

Title 18 U. S. C. §1464 bans the broadcast of "any obscene, indecent, or profane language."   The Federal Communications Commission (Commission) began enforcing §1464 in the 1970's.   In *FCC* v. *Pacifica Foundation*, 438 U. S. 726, this Court found that the Commission's order banning George Carlin's "Filthy Words" monologue passed First Amendment scrutiny, but did not decide whether "an occasional expletive . . . would justify any sanction," *id.,* at 750.   In the ensuing years, the Commission went from strictly observing the narrow circumstances of *Pacifica* to indicating that it would assess the full context of allegedly indecent broadcasts rather than limit its regulation to an index of indecent words or pictures.   However, it continued to note the important difference between isolated and repeated broadcasts of indecent material.   And in a 2001 policy statement, it even included, as one of the factors significant to the determination of what was patently offensive, "whether the material dwells on or repeats at length" the offending description or depiction.

It was against this regulatory background that the three incidents at issue took place.   Two concern isolated utterances of obscene words during two live broadcasts aired by respondent Fox Television Stations, Inc.   The third occurred during an episode of a television show broadcast by respondent ABC Television Network, when the nude buttocks of an adult female character were shown for approximately seven seconds and the side of her breast for a moment.   After these incidents, but before the Commission issued Notices of Apparent Lia-

——————

*Together with *Federal Communications Commission* v. *ABC, Inc., et al.* (see this Court's Rule 12.4), also on certiorari to the same court.

bility to Fox and ABC, the Commission issued its *Golden Globes* Order, declaring for the first time that fleeting expletives could be actionable. It then concluded that the Fox and ABC broadcasts violated this new standard. It found the Fox broadcasts indecent, but declined to propose forfeitures. The Second Circuit reversed, finding the Commission's decision to modify its indecency enforcement regime to regulate fleeting expletives arbitrary and capricious. This Court reversed and remanded for the Second Circuit to address respondents' First Amendment challenges. *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502. On remand, the Second Circuit found the policy unconstitutionally vague and invalidated it in its entirety. In the ABC case, the Commission found the display actionably indecent, and imposed a $27,500 forfeiture on each of the 45 ABC-affiliated stations that aired the episode. The Second Circuit vacated the order in light of its *Fox* decision.

*Held:* Because the Commission failed to give Fox or ABC fair notice prior to the broadcasts in question that fleeting expletives and momentary nudity could be found actionably indecent, the Commission's standards as applied to these broadcasts were vague. Pp. 11–18.

   (a) The fundamental principle that laws regulating persons or entities must give fair notice of what conduct is required or proscribed, see, *e.g., Connally* v. *General Constr. Co.*, 269 U. S. 385, 391, is essential to the protections provided by the Fifth Amendment's Due Process Clause, see *United States* v. *Williams*, 553 U. S. 285, 304, which requires the invalidation of impermissibly vague laws. A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Ibid.* The void for vagueness doctrine addresses at least two connected but discrete due process concerns: Regulated parties should know what is required of them so they may act accordingly; and precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way. When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech. Pp. 11–12.

   (b) These concerns are implicated here, where the broadcasters claim that the lengthy procedural history of their cases shows that they did not have fair notice of what was forbidden. Under the 2001 Guidelines in force when the broadcasts occurred, a key consideration was "whether the material dwell[ed] on or repeat[ed] at length" the offending description or depiction, but in the 2004 *Golden Globes* Order, issued after the broadcasts, the Commission changed course and held that fleeting expletives could be a statutory violation. It then

applied this new principle to these cases. Its lack of notice to Fox and ABC of its changed interpretation failed to give them "fair notice of what is prohibited." *Williams*, *supra*, at 304. Pp. 12–13.

(c) Neither of the Government's contrary arguments is persuasive. It claims that Fox cannot establish unconstitutional vagueness because the Commission declined to impose a forfeiture on Fox and said that it would not consider the indecent broadcast in renewing station licenses or in other contexts. But the Commission has the statutory power to take into account "any history of prior offenses" when setting a forfeiture penalty, 47 U. S. C. §503(b)(2)(E), and the due process protection against vague regulations "does not leave [regulated parties] . . . at the mercy of *noblesse oblige*." *United States* v. *Stevens*, 559 U. S. ___, ___. The challenged orders could also have an adverse impact on Fox's reputation with audiences and advertisers alike.

The Government argues that ABC had notice that its broadcast would be considered indecent. But an isolated statement in a 1960 Commission decision declaring that televising nudes might be contrary to §1464 does not suffice for the fair notice required when the Government intends to impose over a $1 million fine for allegedly impermissible speech. Moreover, previous Commission decisions had declined to find isolated and brief moments of nudity actionably indecent. In light of these agency decisions, and the absence of any notice in the 2001 Guidance that seven seconds of nude buttocks would be found indecent, ABC lacked constitutionally sufficient notice prior to being sanctioned. Pp. 13–17.

(d) It is necessary to make three observations about this decision's scope. First, because the Court resolves these cases on fair notice grounds under the Due Process Clause, it need not address the First Amendment implications of the Commission's indecency policy or reconsider *Pacifica* at this time. Second, because the Court rules that Fox and ABC lacked notice at the time of their broadcasts that their material could be found actionably indecent under then-existing policies, the Court need not address the constitutionality of the current indecency policy as expressed in the *Golden Globes* Order and subsequent adjudications. Third, this opinion leaves the Commission free to modify its current indecency policy in light of its determination of the public interest and applicable legal requirements and leaves courts free to review the current, or any modified, policy in light of its content and application. Pp. 17–18.

613 F. 3d 317 (first case) and 404 Fed. Appx. 530 (second case), vacated and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, BREYER, ALITO, and KAGAN, JJ., joined.

Syllabus

GINSBURG, J., filed an opinion concurring in the judgment.  SOTOMAYOR, J., took no part in the consideration or decision of the cases.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–1293

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,
PETITIONERS *v.* FOX TELEVISION STATIONS, INC.,
ET AL.

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,
PETITIONERS *v.* ABC, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 21, 2012]

JUSTICE KENNEDY delivered the opinion of the Court.

In *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 529 (2009) *(Fox I)*, the Court held that the Federal Communication Commission's decision to modify its indecency enforcement regime to regulate so-called fleeting expletives was neither arbitrary nor capricious. The Court then declined to address the constitutionality of the policy, however, because the United States Court of Appeals for the Second Circuit had yet to do so. On remand, the Court of Appeals found the policy was vague and, as a result, unconstitutional. 613 F. 3d 317 (2010). The case now returns to this Court for decision upon the constitutional question.

I

In *Fox I*, the Court described both the regulatory framework through which the Commission regulates broadcast indecency and the long procedural history of

this case. The Court need not repeat all that history, but some preliminary discussion is necessary to understand the constitutional issue the case now presents.

## A

Title 18 U. S. C. §1464 provides that "[w]hoever utters any obscene, indecent, or profane language by means of radio communication shall be fined . . . or imprisoned not more than two years, or both." The Federal Communications Commission (Commission) has been instructed by Congress to enforce §1464 between the hours of 6 a.m. and 10 p.m., see Public Telecommunications Act of 1992, §15(a), 106 Stat. 954, note following 47 U. S. C. §303, p. 113 (Broadcasting of Indecent Programming). And the Commission has applied its regulations to radio and television broadcasters alike, see *Fox I*, *supra,* at 505–506; see also 47 CFR §73.3999 (2010) (Commission regulation prohibiting the broadcast of any obscene material or any indecent material between 6 a.m. and 10 p.m.). Although the Commission has had the authority to regulate indecent broadcasts under §1464 since 1948 (and its predecessor commission, the Federal Radio Commission, since 1927), it did not begin to enforce §1464 until the 1970's. See Campbell, *Pacifica* Reconsidered: Implications for the Current Controversy over Broadcast Indecency, 63 Fed. Com. L. J. 195, 198 (2010).

This Court first reviewed the Commission's indecency policy in *FCC* v. *Pacifica Foundation*, 438 U. S. 726 (1978). In *Pacifica*, the Commission determined that George Carlin's "Filthy Words" monologue was indecent. It contained "'language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs, at times of the day when there is a reasonable risk that children may be in the audience.'" *Id.,* at 732 (quoting 56 F. C. C. 2d 94, 98 (1975)). This Court upheld

the Commission's ruling. The broadcaster's statutory challenge was rejected. The Court held the Commission was not engaged in impermissible censorship within the meaning of 47 U. S. C. §326 (1976 ed.), see 438 U. S., at 735–739, and that §1464's definition of indecency was not confined to speech with an appeal to the prurient interest, see *id.,* at 738–741. Finding no First Amendment violation, the decision explained the constitutional standard under which regulations of broadcasters are assessed. It observed that "broadcast media have established a uniquely pervasive presence in the lives of all Americans," *id.,* at 748, and that "broadcasting is uniquely accessible to children, even those too young to read," *id.,* at 749. In light of these considerations, "broadcasting . . . has received the most limited First Amendment protection." *Id.,* at 748. Under this standard the Commission's order passed constitutional scrutiny. The Court did note the narrowness of its holding, explaining that it was not deciding whether "an occasional expletive . . . would justify any sanction." *Id.,* at 750; see also *id.,* at 760–761 (Powell, J., concurring in part and concurring in judgment) ("[C]ertainly the Court's holding . . . does not speak to cases involving the isolated use of a potentially offensive word in the course of a radio broadcast, as distinguished from the verbal shock treatment administered by respondent here").

From 1978 to 1987, the Commission did not go beyond the narrow circumstances of *Pacifica* and brought no indecency enforcement actions. See *In re Infinity Broadcasting Corp.,* 3 FCC Rcd. 930 (1987); see also *In re Application of WGBH Educ. Foundation,* 69 F. C. C. 2d 1250, 1254 (1978) (Commission declaring it "intend[s] strictly to observe the narrowness of the *Pacifica* holding"). Recognizing that *Pacifica* provided "no general prerogative to intervene in any case where words similar or identical to those in *Pacifica* are broadcast over a licensed radio or television station," the Commission distinguished between

the "repetitive occurrence of the 'indecent' words" (such as in the Carlin monologue) and an "isolated" or "occasional" expletive, that would not necessarily be actionable. 69 F. C. C. 2d, at 1254.

In 1987, the Commission determined it was applying the *Pacifica* standard in too narrow a way. It stated that in later cases its definition of indecent language would "appropriately includ[e] a broader range of material than the seven specific words at issue in [the Carlin monologue]." *In re Pacifica Foundation Inc.*, 2 FCC Rcd. 2698, 2699. Thus, the Commission indicated it would use the "generic definition of indecency" articulated in its 1975 *Pacifica* order, *Infinity* Order, 3 FCC Rcd., at 930, and assess the full context of allegedly indecent broadcasts rather than limiting its regulation to a "comprehensive index . . . of indecent words or pictorial depictions," *id.,* at 932.

Even under this context based approach, the Commission continued to note the important difference between isolated and repeated broadcasts of indecent material. See *ibid.* (considering variables in determining whether material is patently offensive including "whether allegedly offensive material is isolated or fleeting"). In the context of expletives, the Commission determined "deliberate and repetitive use in a patently offensive manner is a requisite to a finding of indecency." *Pacifica* Order, 2 FCC Rcd., at 2699. For speech "involving the description or depiction of sexual or excretory functions . . . [t]he mere fact that specific words or phrases are not repeated does not mandate a finding that material that is otherwise patently offensive . . . is not indecent." *Ibid.*

In 2001, the Commission issued a policy statement intended "to provide guidance to the broadcast industry regarding [its] caselaw interpreting 18 U. S. C. §1464 and [its] enforcement policies with respect to broadcast indecency." *In re Industry Guidance on Commission's Case Law Interpreting 18 U. S. C. §1464 and Enforcement*

*Policies Regarding Broadcast Indecency*, 16 FCC Rcd.
7999. In that document the Commission restated that for
material to be indecent it must depict sexual or excretory
organs or activities and be patently offensive as measured
by contemporary community standards for the broadcast
medium. *Id.,* at 8002. Describing the framework of what
it considered patently offensive, the Commission explained
that three factors had proved significant:

> "(1) [T]he explicitness or graphic nature of the de-
> scription or depiction of sexual or excretory organs or
> activities; (2) whether the material dwells on or re-
> peats at length descriptions of sexual or excretory or-
> gans or activities; (3) whether the material appears to
> pander or is used to titillate, or whether the material
> appears to have been presented for its shock value."
> *Id.,* at 8003 (emphasis deleted).

As regards the second of these factors, the Commission
explained that "[r]epetition of and persistent focus on
sexual or excretory material have been cited consistently
as factors that exacerbate the potential offensiveness of
broadcasts. In contrast, where sexual or excretory refer-
ences have been made once or have been passing or fleet-
ing in nature, this characteristic has tended to weigh
against a finding of indecency." *Id.,* at 8008. The Com-
mission then gave examples of material that was not
found indecent because it was fleeting and isolated, *id.,* at
8008–8009 (citing, *e.g., L. M. Communications of South
Carolina, Inc. (WYBB(FM))*, 7 FCC Rcd. 1595 (MMB 1992)
(finding "a fleeting and isolated utterance" in the context
of live and spontaneous programming not actionable)), and
contrasted it with fleeting references that were found
patently offensive in light of other factors, 16 FCC Rcd., at
8009 (citing, *e.g., Tempe Radio, Inc. (KUPD–FM)*, 12 FCC
Rcd. 21828 (MMB 1997) (finding fleeting language that
clearly refers to sexual activity with a child to be patently

offensive)).

### B

It was against this regulatory background that the three incidents of alleged indecency at issue here took place. First, in the 2002 Billboard Music Awards, broadcast by respondent Fox Television Stations, Inc., the singer Cher exclaimed during an unscripted acceptance speech: "I've also had my critics for the last 40 years saying that I was on my way out every year. Right. So f*** 'em." 613 F. 3d, at 323. Second, Fox broadcast the Billboard Music Awards again in 2003. There, a person named Nicole Richie made the following unscripted remark while presenting an award: "Have you ever tried to get cow s*** out of a Prada purse? It's not so f***ing simple." *Ibid.* The third incident involved an episode of NYPD Blue, a regular television show broadcast by respondent ABC Television Network. The episode broadcast on February 25, 2003, showed the nude buttocks of an adult female character for approximately seven seconds and for a moment the side of her breast. During the scene, in which the character was preparing to take a shower, a child portraying her boyfriend's son entered the bathroom. A moment of awkwardness followed. 404 Fed. Appx. 530, 533–534 (CA2 2011). The Commission received indecency complaints about all three broadcasts. See *Fox I*, 556 U. S., at 510; 404 Fed. Appx., at 534.

After these incidents, but before the Commission issued Notices of Apparent Liability to Fox and ABC, the Commission issued a decision sanctioning NBC for a comment made by the singer Bono during the 2003 Golden Globe Awards. Upon winning the award for Best Original Song, Bono exclaimed: "'This is really, really, f***ing brilliant. Really, really great.'" *In re Complaints Against Various Broadcast Licensees Regarding Their Airing of the "Golden Globe Awards" Program*, 19 FCC Rcd. 4975, 4976, n. 4

(2004) (*Golden Globes* Order). Reversing a decision by its enforcement bureau, the Commission found the use of the F-word actionably indecent. *Id.,* at 4975–4976. The Commission held that the word was "one of the most vulgar, graphic and explicit descriptions of sexual activity in the English language," and thus found "any use of that word or a variation, in any context, inherently has a sexual connotation." *Id.,* at 4978–4979. Turning to the isolated nature of the expletive, the Commission reversed prior rulings that had found fleeting expletives not indecent. The Commission held "the mere fact that specific words or phrases are not sustained or repeated does not mandate a finding that material that is otherwise patently offensive to the broadcast medium is not indecent." *Id.,* at 4980; see also *id.,* at 4982 ("Just as the Court [in *Pacifica*] held that . . . the George Carlin routine 'could have enlarged a child's vocabulary in an instant,' we believe that even isolated broadcasts of the 'F-Word' in situations such as that here could do so as well").

C

Even though the incidents at issue in these cases took place before the *Golden Globes* Order, the Commission applied its new policy regarding fleeting expletives and fleeting nudity. It found the broadcasts by respondents Fox and ABC to be in violation of this standard.

1

As to Fox, the Commission found the two Billboard Awards broadcasts indecent in *In re Complaints Regarding Various Television Broadcasts Between February 2, 2002, and March 8, 2005*, 21 FCC Rcd. 2664 (2006). Numerous parties petitioned for a review of the order in the United States Court of Appeals for the Second Circuit. The Court of Appeals granted the Commission's request for a voluntary remand so that it could respond to the

parties' objections. *Fox Television Stations, Inc.* v. *FCC*, 489 F. 3d 444, 453 (2007). In its remand order, the Commission applied its tripartite definition of patently offensive material from its 2001 Order and found that both broadcasts fell well within its scope. See *In re Complaints Regarding Various Television Broadcasts Between February 2, 2002, and March 8, 2005*, 21 FCC Rcd. 13299 (2006) (*Remand* Order); see also *Fox I, supra,* at 511–513 (discussing in detail the Commission's findings). As pertains to the constitutional issue in these cases, the Commission noted that under the policy clarified in the *Golden Globes* Order, "categorically requiring repeated use of expletives in order to find material indecent is inconsistent with our general approach to indecency enforcement." *Remand* Order, 21 FCC Rcd., at 13308; see also *id.,* at 13325 ("[U]nder our *Golden Globe* precedent, the fact that Cher used the 'F-word' once does not remove her comment from the realm of actionable indecency"). Though the Commission deemed Fox should have known Nicole Richie's comments were actionably indecent even prior to the *Golden Globes* Order, 21 FCC Rcd., at 13307, it declined to propose a forfeiture in light of the limited nature of the Second Circuit's remand. *Id.,* at 13321. The Commission acknowledged that "it was not apparent that Fox could be penalized for Cher's comment at the time it was broadcast." And so, as in the Golden Globes case it imposed no penalty for that broadcast. *Id.,* at 13324, 13326.

Fox and various intervenors returned to the United States Court of Appeals for the Second Circuit, raising administrative, statutory, and constitutional challenges to the Commission's indecency regulations. See *Fox Television Stations, Inc.* v. *FCC*, 489 F. 3d 444. In a 2-to-1 decision, with Judge Leval dissenting, the Court of Appeals found the *Remand* Order arbitrary and capricious because "the FCC has made a 180-degree turn regarding its treatment of 'fleeting expletives' without providing a reasoned

explanation justifying the about-face."  489 F. 3d, at 455. While noting its skepticism as to whether the Commission's fleeting expletive regime "would pass constitutional muster," the Court of Appeals found it unnecessary to address the issue. *Id.,* at 462.

The case came here on certiorari.  Citing the Administrative Procedure Act, 5 U. S. C. §551 *et seq.,* this Court noted that the Judiciary may set aside agency action that is arbitrary or capricious.  In the context of a change in policy (such as the Commission's determination that fleeting expletives could be indecent), the decision held an agency, in the ordinary course, should acknowledge that it is in fact changing its position and "show that there are good reasons for the new policy." *Fox I*, 553 U. S., at 515. There is no need, however, for an agency to provide detailed justifications for every change or to show that the reasons for the new policy are better than the reasons for the old one. *Ibid.*

Judged under this standard, the Court in *Fox I* found the Commission's new indecency enforcement policy neither arbitrary nor capricious. *Id.,* at 517.  The Court noted the Commission had acknowledged breaking new ground in ruling that fleeting and nonliteral expletives could be indecent under the controlling standards; the Court concluded the agency's reasons for expanding the scope of its enforcement activity were rational. *Ibid.*  Not only was it "certainly reasonable to determine that it made no sense to distinguish between literal and nonliteral uses of offensive words," *ibid.,* but the Court agreed that the Commission's decision to "look at the patent offensiveness of even isolated uses of sexual and excretory words fits with the context-based approach [approved] . . . in *Pacifica.*" *Ibid.* Given that "[e]ven isolated utterances can . . . constitute harmful 'first blow[s]' to children," the Court held that the Commission could "decide it needed to step away from its old regime where nonrepetitive use of an expletive

was *per se* nonactionable." *Id.,* at 518. Having found the agency's action to be neither arbitrary nor capricious, the Court remanded for the Court of Appeals to address respondents' First Amendment challenges. *Id.,* at 529–530.

On remand from *Fox I*, the Court of Appeals held the Commission's indecency policy unconstitutionally vague and invalidated it in its entirety. 613 F. 3d, at 327. The Court of Appeals found the policy, as expressed in the 2001 Guidance and subsequent Commission decisions, failed to give broadcasters sufficient notice of what would be considered indecent. Surveying a number of Commission adjudications, the court found the Commission was inconsistent as to which words it deemed patently offensive. See *id.,* at 330. It also determined that the Commission's presumptive prohibition on the F-word and the S-word was plagued by vagueness because the Commission had on occasion found the fleeting use of those words not indecent provided they occurred during a bona fide news interview or were "demonstrably essential to the nature of an artistic or educational work." *Id.,* at 331 (internal quotation marks omitted). The Commission's application of these exceptions, according to the Court of Appeals, left broadcasters guessing whether an expletive would be deemed artistically integral to a program or whether a particular broadcast would be considered a bona fide news interview. The Court of Appeals found the vagueness inherent in the policy had forced broadcasters to "choose between not airing . . . controversial programs [or] risking massive fines or possibly even loss of their licenses." *Id.,* at 334. And the court found that there was "ample evidence in the record" that this harsh choice had led to a chill of protected speech. *Ibid.*

2

The procedural history regarding ABC is more brief. On February 19, 2008, the Commission issued a forfeiture

order finding the display of the woman's nude buttocks in NYPD Blue was actionably indecent. See *In re Complaints Against Various Television Licensees Concerning Their February 24, 2003 Broadcast of the Program "NYPD Blue"*, 23 FCC Rcd. 3147 (2008). The Commission determined that, regardless of medical definitions, displays of buttocks fell within the category of displays of sexual or excretory organs because the depiction was "widely associated with sexual arousal and closely associated by most people with excretory activities." *Id.,* at 3150. The scene was deemed patently offensive as measured by contemporary community standards, *ibid.;* and the Commission determined that "[t]he female actor's nudity is presented in a manner that clearly panders to and titillates the audience," *id.,* at 3153. Unlike in the Fox case, the Commission imposed a forfeiture of $27,500 on each of the 45 ABC-affiliated stations that aired the indecent episode. In a summary order the United States Court of Appeals for the Second Circuit vacated the forfeiture order, determining that it was bound by its *Fox* decision striking down the entirety of the Commission's indecency policy. See 404 Fed. Appx., at 533.

The Government sought review of both judgments, see Brief for Petitioners 1, and this Court granted certiorari, 564 U. S. \_\_\_\_ (2011). These are the cases before us.

## II

A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required. See *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law"); *Papachristou* v. *Jacksonville*, 405 U. S. 156, 162 (1972)

("Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids'" (quoting *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453 (1939) (alteration in original))). This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment. See *United States* v. *Williams*, 553 U. S. 285, 304 (2008). It requires the invalidation of laws that are impermissibly vague. A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Ibid.* As this Court has explained, a regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved. See *id.,* at 306.

Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way. See *Grayned* v. *City of Rockford*, 408 U. S. 104, 108–109 (1972). When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.

These concerns are implicated here because, at the outset, the broadcasters claim they did not have, and do not have, sufficient notice of what is proscribed. And leaving aside any concerns about facial invalidity, they contend that the lengthy procedural history set forth above shows that the broadcasters did not have fair notice of what was forbidden. Under the 2001 Guidelines in force when the broadcasts occurred, a key consideration

was "'whether the material dwell[ed] on or repeat[ed] at length'" the offending description or depiction. 613 F. 3d, at 322. In the 2004 *Golden Globes* Order, issued after the broadcasts, the Commission changed course and held that fleeting expletives could be a statutory violation. *Fox I*, 556 U. S., at 512. In the challenged orders now under review the Commission applied the new principle promulgated in the *Golden Globes* Order and determined fleeting expletives and a brief moment of indecency were actionably indecent. This regulatory history, however, makes it apparent that the Commission policy in place at the time of the broadcasts gave no notice to Fox or ABC that a fleeting expletive or a brief shot of nudity could be actionably indecent; yet Fox and ABC were found to be in violation. The Commission's lack of notice to Fox and ABC that its interpretation had changed so the fleeting moments of indecency contained in their broadcasts were a violation of §1464 as interpreted and enforced by the agency "fail[ed] to provide a person of ordinary intelligence fair notice of what is prohibited." *Williams*, *supra*, at 304. This would be true with respect to a regulatory change this abrupt on any subject, but it is surely the case when applied to the regulations in question, regulations that touch upon "sensitive areas of basic First Amendment freedoms," *Baggett* v. *Bullitt*, 377 U. S. 360, 372 (1964); see also *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 870–871 (1997) ("The vagueness of [a content-based regulation of speech] raises special First Amendment concerns because of its obvious chilling effect").

The Government raises two arguments in response, but neither is persuasive. As for the two fleeting expletives, the Government concedes that "Fox did not have reasonable notice at the time of the broadcasts that the Commission would consider non-repeated expletives indecent." Brief for Petitioners 28, n. 3. The Government argues, nonetheless, that Fox "cannot establish unconstitutional

vagueness on that basis . . . because the Commission did not impose a sanction where Fox lacked such notice." *Ibid.* As the Court observed when the case was here three Terms ago, it is true that the Commission declined to impose any forfeiture on Fox, see 556 U. S., at 513, and in its order the Commission claimed that it would not consider the indecent broadcasts either when considering whether to renew stations' licenses or "in any other context," 21 FCC Rcd., at 13321, 13326. This "policy of forbearance," as the Government calls it, does not suffice to make the issue moot. Brief for Petitioners 31. Though the Commission claims it will not consider the prior indecent broadcasts "in any context," it has the statutory power to take into account "any history of prior offenses" when setting the level of a forfeiture penalty. See 47 U. S. C. §503(b)(2)(E). Just as in the First Amendment context, the due process protection against vague regulations "does not leave [regulated parties] . . . at the mercy of *noblesse oblige.*" *United States* v. *Stevens*, 559 U. S. ___, ___ (2010) (slip op., at 18). Given that the Commission found it was "not inequitable to hold Fox responsible for [the 2003 broadcast]," 21 FCC Rcd., at 13314, and that it has the statutory authority to use its finding to increase any future penalties, the Government's assurance it will elect not to do so is insufficient to remedy the constitutional violation.

In addition, when combined with the legal consequence described above, reputational injury provides further reason for granting relief to Fox. Cf. *Paul* v. *Davis*, 424 U. S. 693, 708–709 (1976) (explaining that an "alteration of legal status . . . combined with the injury resulting from the defamation" justifies the invocation of procedural safeguards). As respondent CBS points out, findings of wrongdoing can result in harm to a broadcaster's "reputation with viewers and advertisers." Brief for Respondent CBS Television Network Affiliates Assn. et al. 17. This

observation is hardly surprising given that the challenged orders, which are contained in the permanent Commission record, describe in strongly disapproving terms the indecent material broadcast by Fox, see, *e.g.,* 21 FCC Rcd., at 13310–13311, ¶30 (noting the "explicit, graphic, vulgar, and shocking nature of Ms. Richie's comments"), and Fox's efforts to protect children from being exposed to it, see *id.,* at 13311, ¶33 (finding Fox had failed to exercise "'reasonable judgment, responsibility, and sensitivity to the public's needs and tastes to avoid [a] patently offensive broadcas[t]'"). Commission sanctions on broadcasters for indecent material are widely publicized. See, *e.g.,* F. C. C. Fines Fox, N. Y. Times, Feb. 26, 2008, p. E2; F. C. C. Plans Record Fine for CBS, Washington Post, Sept. 24, 2004, p. E1. The challenged orders could have an adverse impact on Fox's reputation that audiences and advertisers alike are entitled to take into account.

With respect to ABC, the Government with good reason does not argue no sanction was imposed. The fine against ABC and its network affiliates for the seven seconds of nudity was nearly $1.24 million. See Brief for Respondent ABC, Inc., et al. 7 (hereinafter ABC Brief). The Government argues instead that ABC had notice that the scene in NYPD Blue would be considered indecent in light of a 1960 decision where the Commission declared that the "televising of nudes might well raise a serious question of programming contrary to 18 U. S. C. §1464." Brief for Petitioners 32 (quoting *Enbanc Programming Inquiry*, 44 FCC 2303, 2307 (internal quotation marks omitted)). This argument does not prevail. An isolated and ambiguous statement from a 1960 Commission decision does not suffice for the fair notice required when the Government intends to impose over a $1 million fine for allegedly impermissible speech. The Commission, furthermore, had released decisions before sanctioning ABC that declined to find isolated and brief moments of nudity actionably inde-

cent. See, *e.g., In re Application of WGBH*, 69 F. C. C. 2d, at 1251, 1255 (declining to find broadcasts containing nudity to be indecent and emphasizing the difference between repeated and isolated expletives); *In re WPBN/ WTOM License Subsidiary, Inc.*, 15 FCC Rcd. 1838, 1840 (2000) (finding full frontal nudity in Schindler's List not indecent). This is not to say, of course, that a graphic scene from Schindler's List involving nude concentration camp prisoners is the same as the shower scene from NYPD Blue. It does show, however, that the Government can point to nothing that would have given ABC affirmative notice that its broadcast would be considered actionably indecent. It is likewise not sufficient for the Commission to assert, as it did in its order, that though "the depiction [of nudity] here is not as lengthy or repeated" as in some cases, the shower scene nonetheless "does contain more shots or lengthier depictions of nudity" than in other broadcasts found not indecent. 23 FCC Rcd., at 3153. This broad language fails to demonstrate that ABC had fair notice that its broadcast could be found indecent. In fact, a Commission ruling prior to the airing of the NYPD Blue episode had deemed 30 seconds of nude buttocks "very brief" and not actionably indecent in the context of the broadcast. See Letter from Norman Goldstein to David Molina, FCC File No. 97110028 (May 26, 1999), in App. to Brief for Respondent ABC Television Affiliates Assn. et al. 1a; see also Letter from Edythe Wise to Susan Cavin, FCC File No. 91100738 (Aug. 13, 1992), *id.*, at 18a, 19a. In light of this record of agency decisions, and the absence of any notice in the 2001 Guidance that seven seconds of nude buttocks would be found indecent, ABC lacked constitutionally sufficient notice prior to being sanctioned.

The Commission failed to give Fox or ABC fair notice prior to the broadcasts in question that fleeting expletives and momentary nudity could be found actionably indecent.

Therefore, the Commission's standards as applied to these broadcasts were vague, and the Commission's orders must be set aside.

## III

It is necessary to make three observations about the scope of this decision. First, because the Court resolves these cases on fair notice grounds under the Due Process Clause, it need not address the First Amendment implications of the Commission's indecency policy. It is argued that this Court's ruling in *Pacifica* (and the less rigorous standard of scrutiny it provided for the regulation of broadcasters, see 438 U. S. 726) should be overruled because the rationale of that case has been overtaken by technological change and the wide availability of multiple other choices for listeners and viewers. See, *e.g.,* ABC Brief 48–57; Brief for Respondent Fox Television Stations, Inc., et al. 15–26. The Government for its part maintains that when it licenses a conventional broadcast spectrum, the public may assume that the Government has its own interest in setting certain standards. See Brief for Petitioners 40–53. These arguments need not be addressed here. In light of the Court's holding that the Commission's policy failed to provide fair notice it is unnecessary to reconsider *Pacifica* at this time.

This leads to a second observation. Here, the Court rules that Fox and ABC lacked notice at the time of their broadcasts that the material they were broadcasting could be found actionably indecent under then-existing policies. Given this disposition, it is unnecessary for the Court to address the constitutionality of the current indecency policy as expressed in the *Golden Globes* Order and subsequent adjudications. The Court adheres to its normal practice of declining to decide cases not before it. See, *e.g., Sweatt* v. *Painter*, 339 U. S. 629, 631 (1950) ("Broader issues have been urged for our consideration, but we

adhere to the principle of deciding constitutional questions only in the context of the particular case before the Court").

Third, this opinion leaves the Commission free to modify its current indecency policy in light of its determination of the public interest and applicable legal requirements. And it leaves the courts free to review the current policy or any modified policy in light of its content and application.

\*      \*      \*

The judgments of the United States Court of Appeals for the Second Circuit are vacated, and the cases are remanded for further proceedings consistent with the principles set forth in this opinion.

*It is so ordered.*

JUSTICE SOTOMAYOR took no part in the consideration or decision of these cases.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–1293

_____

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,
PETITIONERS *v.* FOX TELEVISION STATIONS, INC.,
ET AL.

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,
PETITIONERS *v.* ABC, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 21, 2012]

JUSTICE GINSBURG, concurring in the judgment.

In my view, the Court's decision in *FCC* v. *Pacifica Foundation*, 438 U. S. 726 (1978), was wrong when it issued. Time, technological advances, and the Commission's untenable rulings in the cases now before the Court show why *Pacifica* bears reconsideration. Cf. *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 532–535 (2009) (THOMAS, J., concurring).