# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 20, 2026

Lyle W. Cayce
Clerk

No. 24-60420

Florida Gas Transmission Company, L.L.C., a subsidiary of Energy Transfer, L.P.,

*Petitioner*,

*versus*

United States Department of Transportation; Pipeline and Hazardous Materials Safety Administration; Office of Pipeline Safety,

*Respondents*.

_____

Petition for Review of an Order of the
Department of Transportation, National Transportation Safety Board
Agency No. 4-2022-032-NOPV

_____

Before Haynes, Ho, and Oldham, *Circuit Judges*.

Per Curiam:[*]

A natural gas pipeline burst. The Pipeline and Hazardous Materials Safety Administration, an agency within the U.S. Department of Transportation, investigated the incident. It determined that the company that owns and operates the pipeline violated two federal regulations, and

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

imposed fines accordingly.  But we hold that the company complied with all applicable regulations, and thus vacate the agency's final order.

## I.

Florida Gas Transmission Company is a natural gas transportation company.  Florida Gas operates the Sanford Lateral, a pipeline built in 1959 and previously operated by Enron.  The line is made of low-frequency electric-resistance-welded steel pipe.  This type of pipe has seams which can be vulnerable to corrosion and related seam-integrity issues.

Like most long-lived pipelines, the Sanford Lateral has experienced ruptures, anomalies, and other incidents.  It suffered ruptures in 2009 and 2012.  But the cause of these ruptures is unknown.  In 2014, Florida Gas identified an anomaly on the line and, treating it as corrosion, installed a sleeve to remediate the area.  As part of its integrity-management program, Florida Gas conducted in-line inspections in 2014 and 2019 using an axially aligned magnetic-flux-leakage (MFL-A) tool.  By contrast, a circumferential magnetic-flux leakage (MFL-C) tool is better suited to detect certain seam anomalies.  *See* Florida Gas Transmission Company, Final Order, CPF No. 4-2022-032-NOPV, *12 (May 21, 2024) ("MFL-C [tools are] more sensitive [than MFL-A tools] to axially aligned metal-loss defects." (quotations omitted)).

In 2020, the pipeline ruptured along its longitudinal seam.  The escaping gas ignited and burned roughly 51,500 square feet of land, causing significant property damage but, fortunately, no injuries.

Subsequent inspection and failure analysis revealed the cause of the rupture as stress-corrosion cracking, a type of corrosion which forms on the outside of the pipeline and does not involve significant metal loss.  Stress-corrosion cracking is challenging to spot because, "[u]nlike a component widely known to have manufacturing defects that can be identified by an

operator in various ways, stress-corrosion cracking is an issue that can take decades to develop and typically needs to be confirmed by metallurgical analysis." *Id.* at *8.

After the accident, the Pipeline and Hazardous Materials Safety Administration investigated and issued a corrective action order requiring inspection and remediation of the pipeline. It subsequently issued a notice of probable violation alleging three regulatory violations. Florida Gas disputed the allegations and requested a hearing before the agency. After the hearing, the agency issued a final order, concluding that Florida Gas had violated 49 C.F.R. § 192.619, which governs the "maximum allowable operating pressure" (MAOP), and 49 C.F.R. § 192.937(c)(1), which governs tool use when evaluating pipes.

Florida Gas appealed, arguing that the final order was arbitrary and capricious, and that it violated fair notice.

## II.

We review final agency action and penalty determinations under an arbitrary and capricious standard.[1]  *See* 5 U.S.C. § 706; *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 582 (5th Cir. 2017). And we review fair notice claims de novo. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

---

[1] Because this case involves an agency's interpretation of its own regulations, the shadow of interpretive deference looms large. But neither party contends that any of the regulations present ambiguity potentially warranting such deference. Because of this, we decline Florida Gas's invitation to reevaluate our approach to *Auer, Kisor,* and *Seminole* deference.

## A.

Under § 192.619(a), pipelines can establish MAOP under either the "four pressures" method in § 192.619(a) or the grandfather clause in § 192.619(c). They also must "make and maintain records necessary to establish and document the MAOP." 49 C.F.R. § 192.619(f).

The agency claims that Florida Gas violated § 192.619(a)(3) by failing to maintain adequate records to substantiate the Sanford Lateral's MAOP. But § 192.619(a)(3) only describes how to calculate MAOP. It says nothing about maintaining "operating pressure records." *See* Florida Gas Transmission Company, Notice of Probable Violation and Proposed Civil Penalty, CPF No. 4-2022-032-NOPV (July 22, 2022). The agency's decision to proceed under § 192.619(a)(3) instead effectively converts an operating-limit provision into an after-the-fact paperwork rule, and it does so without any textual hook.

For recordkeeping violations, it would have been natural to proceed under § 192.619(f). This section directs operators to "make and maintain records necessary to establish and document the MAOP." 49 C.F.R. § 192.619(f). And the section provides a mechanism for reconfirmation if a pipeline does not have the requisite records. *Id.* The deadline for reconfirmation stretches from 2028 to 2035. *See id.* § 192.624. But the agency chose not to bring that charge.

The agency's atextual gloss on § 192.619(a)(3) fails to give fair notice. Regulatory violations can only result in fines where a party has "fair warning of the conduct it prohibits or requires, and it must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents." *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976). But § 192.619(a)(3) says nothing about recordkeeping.

No. 24-60420

Yet somehow the agency fined Florida Gas under this regulation for failing to hand over "operating pressure records."

The agency could have brought a charge under § 192.619(f). But it did not, and it is unclear if such a charge would have been successful. Section 192.619(f) has specific deadline requirements for pipelines that have not maintained their records. *See* 49 C.F.R. § 192.624 (stating that the deadline to create new records to verify the MAOP stretches from 2028 to 2035). Using § 192.619(a)(3) as a backdoor records rule short-circuits the carefully crafted reconfirmation regime and deprives operators of the fair notice those reconfirmation provisions were designed to provide.[2]

**B.**

Florida Gas was also fined under § 192.937 for failing to use an MFL-C tool during its 2019 inspection of the Sanford Lateral.[3] Section 192.937(c) instructs that "an operator must assess the integrity of the line pipe in each covered segment by . . . methods best suited to address the threats identified on the covered segment (*see* § 192.917)." One such method is using "tools capable of detecting corrosion . . . and any other threats to which the covered

---

[2] Even if the agency did impose some extra-textual recordkeeping requirement, it's far from clear that Florida Gas comes up short. Florida Gas provided the agency with an "Enron Gold Sheet," which purported to provide the MAOP. Although it is not a perfect record, it is better than nothing. So to find liability, the agency not only has to summon a recordkeeping requirement from thin air, it also has to be a fairly extensive one.

[3] The pipeline rupture occurred in September of 2020, after the promulgation of new rules for 192.937(c) and 192.917 on July 1, 2020. However, the infraction which Florida Gas is penalized for—essentially selecting the wrong tool to inspect the pipe in 2019—took place prior to the promulgation of the new rules. Therefore, we agree with both parties that we should apply the prior language of the rules in this case.

segment is susceptible." 49 C.F.R. § 192.937(c)(1). Those tools must be chosen in accordance with certain industry standards. *Id.*

To determine what threats the covered segment is susceptible to, "[a]n operator must identify and evaluate all potential threats to each covered pipeline segment." 49 C.F.R. § 192.917(a). These threats include forces "such as internal corrosion, external corrosion, and stress corrosion cracking." *Id.* And the regulation provides further guidance for when such corrosion threatens low-frequency electric resistance welded steel pipe, the kind used here:

> If a covered pipeline segment contains low frequency electric resistance welded pipe (ERW) . . . , and any covered or noncovered segment in the pipeline system with such pipe has experienced seam failure, or operating pressure on the covered segment has increased over the maximum operating pressure experienced during the preceding five years, an operator must select an assessment technology or technologies with a proven application capable of assessing seam integrity and seam corrosion anomalies.

*Id.* § 192.917(e)(4) (2004). In short, if there has been an MAOP violation in the past five years or the pipeline has experienced seam failure, then the pipeline is susceptible to seam corrosion.

This case comes down to whether the pipeline was susceptible to seam failure under § 192.937. Parties agree that such susceptibility is determined by § 192.917. Parties also agree that, if susceptibility to corrosion had been previously established, then Florida Gas violated the regulation by failing to use MFL-C tooling.

So the dispute is not whether § 192.917 determines susceptibility, but rather the scope of the susceptibility analysis. Florida Gas says susceptibility sufficient to require use of an MFL-C tool exists only when § 192.917(e)(4)

is met—i.e., recent overpressure or a past seam failure. But the agency argues that "nothing in the terms of § 192.917(e)(4) purports to displace the tool-selection directive in § 192.937(c)(1) or the threat-identification process in § 192.917(a) and (b)." At the end of the day, even the agency's reading of § 192.917 fails to support susceptibility here.

If § 192.917(e)(4) exclusively governs susceptibility analysis here, this is a straightforward case. There was no MAOP violation and no seam failure before the rupture. So the line wasn't susceptible to corrosion, and use of an MFL-C tool wasn't required.

The agency's contrary claim of seam failure fails on its own sources. In discussing the 2009 and 2012 ruptures, they cite the final order here, for the proposition that in-system pipes have experienced seam failure. The order in turn cites a set of corrective action orders. Neither of those orders confirm that seam failure has occurred. Florida Gas Transmission Company, Corrective Action Order, CPF No. 2-2009-1002H (May 7, 2009) ("the cause of the failure is unknown;" "seam *may* be a factor"(emphasis added)); Florida Gas Transmission Company, Corrective Action Order, CPF No. 2-2012-1005H (Dec. 28, 2012) ("The cause of the failure is unknown, and the investigation is ongoing.").

Nor does the prior 2015 tool run help the agency establish seam failure. Installing a sleeve after an anomalous scan is conservative remediation, not proof of seam failure; the Florida Gas's over-caution explanation fits the record.

Seam failure has not been established, so § 192.917(e)(4) is not triggered. We're left with the more general provisions of § 192.917(a) and (b).

*ExxonMobil* forecloses a violation under § 192.917(a) and (b). *See ExxonMobil*, 867 F.3d at 574. Those provisions require operators to

"consider" and "take into account" certain information regarding threats to pipeline segments. And in *ExxonMobil*, we found that such language "unambiguously serves to inform a pipeline operator's careful and deliberate decision-making process rather than to compel a particular outcome." *Id.* So too here. *Compare* 49 C.F.R. § 192.917(a) (regulation here that operators "must consider" certain threats), *with* 49 C.F.R. § 195.452(e)(1) (regulation in *ExxonMobil* that "operator[s] must consider" certain threats). These provisions do not require a particular outcome, so Florida Gas cannot be fined for not reaching a particular outcome, i.e., using an MFL-C tool.

The agency's attempt to distinguish *ExxonMobil* is unavailing. They claim that the regulation here is different because it "singles out specific threats—including 'fabrication or construction defects'—that operators must take note of or bear in mind as part of their duty to 'identify and evaluate all potential threats.'" But that's no different than the regulation in *ExxonMobil*. That regulation similarly singled out potential threats—including "defect type and size"—that operators must bear in mind as part of their duty to consider "all risk factors." 49 C.F.R. § 195.452(e)(1).

Next, the agency says *ExxonMobil* is different because Exxon had a formal and sophisticated process for considering risks and susceptibility. But so does Florida Gas. This is no surprise as Florida Gas is a subsidiary of Energy Transfer LP, one of the largest and most sophisticated midstream companies in the United States. And the agency's claim of deficiency in susceptibility analysis is further belied by the fact that Florida Gas escaped a § 192.917(a)(1) violation at the hearing by showing nonsusceptibility to stress-corrosion cracking.

In brief, there is no susceptibility to seam failure on this record, so the agency's findings on this point are arbitrary and capricious.

No. 24-60420

\* \* \*

"[Q]uestions of law are for courts rather than agencies to decide." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 393 (2024) (quoting H. R. Rep. No. 1980, 79th Cong., 2d Sess., 44 (1946)) (emphasis deleted). The agency's final order is arbitrary and capricious and fails to give fair notice. Accordingly, we vacate the agency's final order.